UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

UNITED STATES OF AMERICA

v.  Case No. 3:18-CR-138 JD

SVEN ERIC MARSHALL

## OPINION AND ORDER

Defendant Sven Eric Marshall pleaded guilty to mail fraud, securities fraud, and bank fraud, admitting that he swindled his clients (many of them elderly and with limited resources) out of their money under the guise of offering profitable investment opportunities. After the probation officer submitted the Presentence Report ("PSR") (DE 139), Mr. Marshall filed numerous objections. However, in a separate filing, he withdrew some of the objections while reiterating others. (DE 145 & 150.) In particular, Mr. Marshall no longer objects to adding 16 levels for loss amount pursuant to the United States Sentencing Guidelines § 2B1.1(b)(1)(I); an enhancement for causing substantial hardship under § 2B1.1(b)(2)(B); and enhancement for defrauding vulnerable victims under § 3A1.1(b)(1).

Mr. Marshall continued to object to an enhancement for using sophisticated means to defraud his victims under § 2B1.1(b)(10)(C); an enhancement for acting as an investment adviser under § 2B1.1(b)(20)A)(iii); an enhancement for obstruction of justice under § 3C1.1; and the probation officer's failure to reduce his total offense level under § 3E1.1 for acceptance of responsibility. The Government submitted a response opposing Mr. Marshall on every point. (DE 151; 140.) In addition, the Government submitted its own objection to the PSR, arguing that Mr. Marshall's offense level should be increased by 2 levels under § 2B1.1(b)(17)(A) because he

derived more than $1 million in gross receipts from one or more financial institutions as a result of the offense. (DE 140, 151.)

However, on November 30, 2021, the Government withdrew its objection that the PSR did not include an enhancement under § 2B1.1(b)(17)(A) and has joined Mr. Marshall's objections with respect to obstruction of justice and acceptance of responsibility. (DE 155.) Namely, the Government now maintains that the Guideline calculation should not include an obstruction of justice enhancement and should accord Mr. Marshall a 3-level reduction for acceptance of responsibility.

In light of these concessions, only two objections to the PSR remain: Mr. Marshall's objections to the proposed enhancement for using sophisticated means to defraud his victims under § 2B1.1(b)(10)(C) and an enhancement for acting as an investment adviser under § 2B1.1(b)(20)(A)(iii).

**A. The Presentence Report**

The Court will recount the assertions in the PSR that are relevant to the two remaining objections.

Mr. Marshall operated a law firm in South Bend for many years. He practiced in the areas of wills, trusts and estates, and elder law. Mr. Marshall was also a licensed CPA, providing tax preparation and financial accounting services.

Mr. Marshall separately owned a business called Trust & Investment Advisory Services of Indiana ("TIAS") which sold investment securities to clients. TIAS was operated out of the same office as his law firm. TIAS was created in 1998 and remained open through 2018, when a Ponzi scheme Mr. Marshall was running—"robbing Peter to pay Paul"— began to unravel. Mr.

Marshall was offering a 4–8% rate of return on his clients' money. After the investors turned over the money to him, he retained exclusive control and authority to make the investment decisions. Mr. Marshall compensated himself via professional fees, related services, and by using the investors' money for his personal expenses. Each investor was given a certificate promising certain interest rates. All investors were sent monthly statements showing the purported balances. Neither Mr. Marshall nor TIAS were registered with either the SEC or the Indiana Securities Division to sell securities, and Mr. Marshall never disclosed this fact to his investors.

      As part of his TIAS business, Mr. Marshall opened a TIAS account at First Source Bank. It appears that, at least during the early years of TIAS, he may have attempted to make legitimate investments. However, evidence shows that Ponzi-type transfers began by 2003. For example, in November 2003, TIAS received $500,000 from the Flora estate. The money was not invested but rather used for payments to other investors. The Flora estate was later made whole with the money from new investors. Even in 2018, when the scheme was no longer sustainable, Mr. Marshall continued obtaining new investments from clients knowing that the money would be used to prop up his house of cards and to pay himself, not to bring financial security to people who were vulnerable to begin with. Most of Mr. Marshall's victims were elderly and unsophisticated in managing their finances. Some of them turned over to Mr. Marshall the entirety, or a substantial portion, of their life savings or retirement funds. Many victims are now deceased. Some of them intended to leave a portion of their money to charities; others wanted to help their children.

      In addition to providing the "investment services," Mr. Marshall also handled his victims' legal, financial, and tax affairs. At times, he would prepare their tax returns, reporting fictional interest on which the victims were taxed by the IRS.

The last time Mr. Marshall sold a security to an investor was on January 9, 2016. He deposited the money ($16,500) into his law firm business account. He used the money to cover his personal and business expenses.

In September 2016, family members of one of the investors tried to assist the investor to withdraw $150,000. Their efforts were unsuccessful, so they came to South Bend looking for Mr. Marshall at his office. He was not there, but they spoke to an associate attorney who realized that Mr. Marshall was violating the rules of professional conduct and reported him to the Indiana Supreme Court Disciplinary Commission in December 2016. The Commission opened a grievance investigation and eventually suspended Mr. Marshall from the practice of law.

Although Mr. Marshall could no longer practice law, he continued his work as a CPA and continued to run TIAS, mailing false monthly statements to the investors. He turned over nine open estate case files to a different attorney, who discovered illegal monetary transfers. The attorney reported her findings to law enforcement.

Around December 2017 and January 2018, Mr. Marshall stopped communicating with the investors. He closed his office without notice to his clients and went to Myrtle Beach, South Carolina, where he owned a condominium. He continued to live there and out of his car as he travelled between South Carolina and Florida until he was arrested for charges in this case.

**B.     Discussion**

**1.     *An Investment Adviser***

Mr. Marshall claims that he was a full-time attorney and an accountant, not an investment adviser, so that the 4-level enhancement pursuant to § 2B1.1(b)(20)(A)(iii) doesn't apply to him. Mr. Marshall submits that he served thousands of clients in those capacities and his advising the

twenty-one victims was "solely incidental to the practice of his profession." *See* 15 U.S.C. § 80b-2(a)(11)(B) ("'Investment adviser' means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities; but does not include . . . any lawyer, accountant, engineer, or teacher whose performance of such services is *solely incidental* to the practice of his profession.").

      The Court overrules Mr. Marshall's objection. Under § 2B1.1(b)(20)(A)(iii), "[i]f the offense involved a violation of securities law and, at the time of the offense, the defendant was . . . an investment adviser . . . ," the defendant's offense level must be increased by 4 levels. The enhancement applies to Mr. Marshall. Mr. Marshall pleaded guilty to Count 7 of the Superseding Indictment, charging him with securities fraud. The PSR acknowledges that Mr. Marshall practiced law "in the area of wills, trusts, and estates, and other elder law matters" and, as a CPA, "provided tax preparation and financial accounting services to clients." (PSR ¶ 5.) However, contrary to Mr. Marshall's argument, his offense conduct shows that his business of advising others as to the value of securities and the advisability of investing in them was not solely incidental to his practice as an attorney or CPA. Although the statute does not define the phrase "solely incidental to," *see* § 80b-2, its meaning is straightforward. The word "incidental" means "[s]ubordinate to something of greater importance; having a minor role," Black's Law Dictionary, 8th Ed.; "[o]ccurring or apt to occur as an unpredictable or minor concomitant; of a minor, casual, or subordinate nature," Webster's II New College Dictionary, 1999. The words "incidental to" are further modified by "solely" which is an adverb of "sole," meaning "single" or "exclusive," Webster's II New College Dictionary. Yet, Mr. Marshall's advertising and sale of

securities was not concomitant with his practice as a lawyer or CPA as the exception to the term "investment adviser" would require. Rather, he incorporated a business separate from his law and accounting practice, called Trust & *Investment Advisory* Services of Indiana (Court's emphasis), in order to provide investment services. He operated TIAS as its President and CEO. TIAS kept its own business records and was used for sale of investment securities. The facts in the PSR, as well as the letters from Mr. Marshall's victims, show that he advised clients about the value of securities he offered. After his clients made investments, Mr. Marshall exercised exclusive control and complete authority over their money and was the only person to make the decisions about how to use the money. He received separate compensation for his investment services, which further shows that he acted as an investment adviser as defined in 15 U.S.C. § 80b-2(a)(11). These facts demonstrate that Mr. Marshall's conduct in giving investment advice was a completely separate endeavor from other services he provided and was not *solely incidental* to his role as an attorney or accountant.

  That Mr. Marshall conducted his work as an attorney and an accountant much more frequently than as a seller of securities changes nothing. Whether something is "solely incidental to" is not determined in relation to how many clients Mr. Marshall had in total. "To be considered incidental, two actions or objects must be related in a particular way—the incidental action or object must occur only as a result of or in connection with the primary. Additionally, the incidental action or object must be secondary in size or importance to the primary." *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1162 (10th Cir. 2011) (interpreting the phrase "incidental to" in the context of § 80b-2(11)(C)). While Mr. Marshall emphasizes the numeric disparity between his professional activities and the sales of the securities, he has not shown that there's a solely incidental correlation between these activities. To the contrary, as noted above, Mr.

Marshall's sales of securities were part of a separate business, kept apart from law and accounting practices, and accompanied with sales brochures, separate bank accounts, payments to some of the clients, and monthly statements. Because the Government has met its burden in showing that Mr. Marshall, "for compensation, engage[d] in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or . . . for compensation and as part of a regular business, issue[d] or promulgate[d] analyses or reports concerning securities," § 80b-2(a)(11), the Court will overrule his objection on this issue. *See also United States v. Elia*, 579 F. App'x 752, 755 (11th Cir. 2014) (finding that defendant was an investment adviser, for purposes of a sentencing guidelines offense where, although he had no training or license to give investment advice, he gave potential investors brochures with the logo of defendant's "investment" company, advised investors to give him funds and potential investors sent money to defendant's investment fund and gave him complete authority to make investments). As a result, the Court adopts paragraphs 63 and 93 of the PSR.

**2.** *Use of Sophisticated Means*

Mr. Marshall also objects to the PSR adding 2 levels to his offense level under § 2B1.1(b)(10)(C) for using sophisticated means to carry out his offenses. Mr. Marshall argues that there was nothing sophisticated or complex about his crimes: he used a publicly registered corporation; operated out of a well-known law and CPA practice in South Bend; operated under his own name; and used ordinary bank withdrawal slips to access the money. He submits that these factors show that he did not go to extra efforts to hide the illegal nature of his dealings with

his victims. He also denies that he ran a Ponzi scheme. Mr. Marshall's arguments fail to persuade the Court that the enhancement does not apply.

Under § 2B1.1(b)(10)(C), "[i]f . . . the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means," the offense level must be increased by 2 levels. Application Note 9(B) explains that "'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." "Even if any single step is not complicated, repetitive and coordinated conduct can amount to a sophisticated scheme." (quotation marks and citation omitted). *United States v. Huston*, 744 F.3d 589, 592 (8th Cir. 2014). Because all fraud has some degree of concealment, "the adjustment for sophisticated means is warranted only when the conduct shows a greater level of planning or concealment than a typical fraud of its kind." *United States v. Ghaddar*, 678 F.3d 600, 602 (7th Cir. 2012) (internal quotation marks and citation omitted).

Mr. Marshall's offense conduct falls squarely within this guideline as it involved a "greater level of planning or concealment than a typical fraud of its kind." *United States v.* Green, 648 F.3d 569, 576 (7th Cir. 2011). Mr. Marshall did not simply solicit investment money and run with it. Instead, he ran a Ponzi scheme, taking money from investors for his own use and covering up that fact with the money from subsequent investors, thus creating the appearance that all was well with their money, TIAS, and Mr. Marshall.[1] *Cf. United States v. Beckman*, 787

---

[1] "In a Ponzi scheme, an enterprise makes payments to investors with monies received from newly attracted investors, rather than from profits of a legitimate business venture. Generally, investors are promised large returns on their investments, and initial investors are in fact paid sizeable returns. The fact of those payments helps to attract new investors, giving the impression that a legitimate business opportunity exists, even though there is no underlying business venture. All the while, promoters draw off money from the scheme, often to finance lavish lifestyles. Ultimately the scheme collapses, as more and more investors need to be attracted into the scheme so that the growing number of investors on top can get paid. A Ponzi scheme cannot last forever because the investor pool

F.3d 466, 496 (8th Cir. 2015) (finding that Ponzi scheme was by nature obviously complex). He created hundreds of fraudulent TIAS business documents purportedly showing stable investments; produced false 1099 tax forms; filed false tax returns for his investment clients; and moved money around dozens of accounts in order to fund payments when they became due. This activity falls within the sophisticated means enhancement under the guidelines. *Cf. United States v. Landwer*, 640 F.3d 769, 771 (7th Cir. 2011) (upholding district court's finding of a sophisticated scheme where, for seven years, the defendant "created phony documents to conceal fraudulent transactions from victims and authorities, used complex real-estate instruments to scam victims out of property, liquidated clients' investment funds for his own use and channeled the proceeds in a manner that covered up his theft, and sent trumped-up letters to clients falsely reassuring them that their investments were safe")

    Mr. Marshall appears to believe that the sophisticated means enhancement does not apply to him because his conduct is not covered by the illustrations in Comment Note 9(B). That note provides two examples of "sophisticated means": (1) "in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means"; and (2) "Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." Yet, as the note itself makes clear, these are nonexclusive illustrations. *See also United States v. Feaster*, 798 F.3d 1374, 1380 (11th Cir. 2015) ("[T]he illustrations that the Application Note sets forth are a nonexclusive list of examples of sophisticated means of concealment.") (internal quotation marks and brackets omitted). Rather, as cases cited above illustrate, the courts routinely find the use of sophisticated

---

is a limited resource that will eventually run dry." *In re Lake States Commodities, Inc.*, 253 B.R. 866, 869 (Bankr. N.D. Ill. 2000).

9

means even when no offshore accounts, corporate shells, or other means of deception cited in the comment exist.

Finally, Mr. Marshall submits that he engaged in no deception because TIAS was registered with the Indiana Secretary of State, he operated the business under his own name, and used ordinary bank withdrawal slips to access the money. Perhaps that would have been true if the Government's sole contention was that TIAS was a fictitious company. But as explained above, there was much more to defrauding the investors than withdrawing their money in the name of TIAS. To cite just one example, Mr. Marshall used false statements showing illusory earnings, even to the point that he made some of the investors pay taxes on these imaginary gains. In finding that the sophisticated means enhancement applies, the Court has considered the entire scheme, which was complex even if certain aspects of the scheme were simple. In other words, "[i]t does not matter that [Mr. Marshall] might have done a better job perpetrating and concealing the fraud." *United States v. Wayland*, 549 F.3d 526, 529 (7th Cir. 2008). Since "[t]he purpose of the enhancement is to deter elaborate efforts to avoid detection," *United States v. Sykes*, 774 F.3d 1145, 1153 (7th Cir. 2014), it applies to Mr. Marshall. *See United States v. Rettenberger*, 344 F.3d 702, 709 (7th Cir. 2003) (noting, in the context of insurance fraud, that "[c]areful execution and coordination [of a criminal venture] over an extended period" supported a finding of sophisticated means); *United States v. Jensen*, 573 F. App'x 863, 876 (11th Cir. 2014) (ruling that the district court properly applied a sophisticated means enhancement where defendants over a prolonged period of time created documents to lull investors into believing that they were investing in a legitimate securities transaction; sent false account statements to investors; issued false 1099 forms to investors; and made statements to investors to avoid

detection and to convince them that they would lose their investment if they contacted law enforcement). As a result, the Court adopts paragraphs 62 and 92 of the PSR.

**C. Conclusion**

For these reasons the Court—

- GRANTS the Government's motion to withdraw its objection concerning § 2B1.1(b)(17)(A) (deriving more than $1 million in gross receipts from one or more financial institutions as a result of the offense);

- OVERRULES Mr. Marshall's objection to the enhancement for acting as an investment adviser under § 2B1.1(b)(20)(A)(iii);

- OVERRULES Mr. Marshall's objection to the sophisticated means enhancement under § 2B1.1(b)(10)(C).

- SUSTAINS Mr. Marshall's and the Government's objections to the enhancement for obstruction of justice under § 3C1.1 (as a result, 2 levels are subtracted from Mr. Marshall's proposed total offense level); and

- SUSTAINS Mr. Marshall's and the Government's objections to the proposed denial of acceptance of responsibility under § 3E1.1 (as a result, 3 levels are subtracted from Mr. Marshall's proposed total offense level).

The Court MODIFIES the PSR (¶¶ 65, 69, 96, 86, 99, and 100) to be consistent with these Court rulings, which results in Mr. Marshall's total offense level of 32 (37 - 5 = 32).

SO ORDERED.

ENTERED: January 24, 2022

                                             /s/ JON E. DEGUILIO
                                             Chief Judge
                                             United States District Court